The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Oyez, oyez, oyez. All persons having any manner or form of business before the Honorable, the United States Court of Appeals for the Fourth Circuit, are admonished to draw nigh and give their attention. For the Court is now sitting. God save the United States and this Honorable Court. You may be seated. Mr. Confucione. Good morning, Your Honors. Michael Confucione for the appellant. We're asking the Court to reverse the denial of habeas relief by the District Court on the ground that the Maryland State Court unreasonably applied clearly established precedent to Strickland. Obviously, I rely principally on the briefs. I'd like to just highlight maybe a couple of things that I think weigh in favor of my position. If you look at the actual Maryland Court's denial of the ineffective assistance of counsel claim, which I talk about on page 8 of my brief, I don't think that, I think that's an unreasonable application of Strickland for several reasons. First of all, the Maryland Court talks about the defense did not move for a mistrial, but instead decided to move forward with 11 jurors. But the problem with that is it really seems to be assessing whether or not the judge did something wrong. It didn't really talk about the performance of the trial counsel in the context of the situation that existed at the point. And of course, the defendant's claim is he should have asked for a voir dire of the remaining 11 jurors on the panel before he talked to his client about whether or not to proceed with 11 or to opt for the mistrial, which the judge essentially offered as one of the three options. If you had a chance for a mistrial in a case that's a murder case, why would you not take it and then wait and see how it developed? You could have a plea. You could have lots of options. Why isn't that malpractice? By the lawyer? Yeah. I think it is. Yeah. Especially in the context of this case where it was a blind decision. I think if there had been a voir dire and a reasonable hearing, as it's called, and the facts laid out whether or not the other 11 jurors were prejudiced by what the juror for did, and then the lawyer talked to the client about it and said, well, here's our options, there doesn't seem to be any evidence, for example, could have played out that the other 11 jurors were prejudiced. And one of the lawyer's defenses to malpractice is that he knew what the jury was going to do. How did he know what the jury was going to do? Nobody knows what the jury is going to do in a murder case. I agree with your honor. And I think that shows that, you know, there's a reasonable application of the strip on that regard. So in this case, isn't there a problem with the judge as well in terms of a Sixth Amendment? You have a right to a fair trial, right? And the Supreme Court has said the court has a responsibility to make sure that the juror is not tainted in the Sixth Amendment. Because here, right on the faces of it, the judge only asked, the first question was, he read the note and then he said, tell me what happened. That's just an open-end question. And never did anybody listen to it. And then he said, well, is that, then he said, is this in any way going to affect your, and then the witness, the juror interrupted the court and said, no, sir, not at all. So we don't know what he was answering because he cut the judge off. And then the judge didn't do anything. The next thing is, now go back to your seat. Yeah, he never told the other jurors anything about, you know, whatever he listened to. But here's the thing to me in terms of the record. The problem is, you can see what the lawyer's problem is this. The question, the juror told him, pretty honest, why did you let it go? He said, I went because sometimes you see topographical maps, but I know they're not accurate. I wanted to go there for myself to see what's accurate. And then he said, that's what he did. He saw two witnesses, didn't talk to them. But here's the key where the lawyer really blew it. Because they said, now, when he asked questions, would you be impacted by this? He said, the juror said, that's correct. I have no problem with basing my decision. And then, and they would have no problem with their decision off of the evidence which was presented. Well, they must have said something to him because how would he be able to speak for the other jurors? He said, not only me, they wouldn't have any problem. Because what he did was, it's not new evidence he was looking for. He was looking for reassurance because the question was, what was this witness? What was it like? I wanted to see myself. So that's the big thing. Because it's not new evidence. He said, yeah, now that I've seen this, I can base my decision on what I heard. Because I've now been assured. And the other jurors must have been, too. Because then he said, and they would have no problem basing their decision, too, off the evidence that was presented. Because when he said, for him, the evidence presented wasn't quite enough. I wanted to make sure it's accurate. And the court has a responsibility. And the Supreme Court said it was a Sixth Amendment. So not only is the problem, I think, with the idea of a strict analysis, but also a Sixth Amendment constitutional question. And that's not necessarily an improper, unreasonable application of facts. But an application of constitutional law. So this case is a pretty serious case. It's a cogent observation, Your Honor. I mean, I don't want to belabor my oral argument unless the court has questions. Counsel, the issue of Remmer, focusing on that issue, which it seems is your primary briefed issue, has the Supreme Court clearly established that a Remmer hearing applies in a situation like this, where there is a visit to that crime scene as opposed to contact to the jury? Has the Supreme Court clearly established that? I don't think they have.  But you don't have to rely on that. And listen to these facts. This is unique. It's not an external. It's like the juror himself. You don't need one in terms of everything that you need. The problem in this case is right in front of the judge. Yeah. So you have the hearings where you have to say, well, what did the external person say to you? And what was their influence? And all those kind of things. It's right there. He said they would have no problem. And common sense of that is the only way you could say that under oath is that they told him after whatever he said. And they said they would have no problem either. And I went there. It's a verification. And I got the verification. And nobody ever asked a question about what were you looking for? Why did you go? What was it you wanted to make sure? I mean, this is a life sentence. A life sentence. And then went back and then never told the jury you should not do anything that whatever you heard you should disregard. Never. Just go back and continue the deliberation. Because, you know, so it's really not really, it's just dispositive in this case. But that's your primary argument. And, yeah, Judge Gregory makes some fair points. But applying the ADPA standard that we have here, we do look to whether the error was a violation of clearly established Supreme Court law. Don't you agree with that? I agree with that, Your Honor. I guess I would look at it in this way. And I think my adversary has kind of articulated it correctly. Because it arises in the context of an ineffective assistance claim, the clearly established Supreme Court law is still a strict one. But I do think that the Remmer right informs the reasonable performance of counsel issue. And, in fact, even if Remmer didn't squarely apply to the circumstances of the trial of this case, even the state law under Nash that the judge cited in the initial habeas denial in the state court, you know, those kinds of principles show that a lawyer, a reasonable lawyer in those circumstances, would not have proceeded in the manner in which he did. So I don't know if even if you found that, well, there's no clear Supreme Court precedent that extends Remmer to this kind of a crime scene issue, you could still find that the counsel was ineffective under Strickland and that it was an unreasonable application of Strickland by the state court. Can I switch over to the prejudice element? Sure, Your Honor. Don't you have to show a reasonable probability that the outcome would have been different, even if you do show deficient performance? Yes, you do. And I know that Strickland itself kind of talks about reasonable probability in terms of prejudice, and they talk about the evidence. I think in that case it was a death penalty sentencing issue. But there have been cases since Strickland that I've talked about that you can't just look at the outcome in terms of guilt or innocence, that in a case like this, for example, it's about whether or not, as the Sixth Amendment says, the right to an impartial jury was compromised. But when you say that, the Lockhart case refers to that, but it adds that on top of a different outcome. So it's not in lieu of a different outcome. The Weaver case that you cite is dicta, so we're not talking about clearly established Supreme Court law. We're told we can't consider that. So I don't see the basis for you being able to avoid the reasonable probability of a different outcome. Is there some law that tells me we can do that that I'm not aware of or I'm missing? I think my argument would be that the clearly established Supreme Court precedent does not focus solely on whether or not the defendant would have been convicted. It's whether or not he would have, it's really about the impartiality of the jury. What case, I'm sorry to cut you off. No, it's all right, Judge. Did you finish? I want to be fair. No, that's okay. I know where you're at. I understand your argument, but I want to be as precise as we can. What's the Supreme Court precedent that says we do not have to look to see whether there's a reasonable probability of a different outcome? Well, I understand what your Honor is saying about Lockhart, that it seemed to talk about it as an additional factor. But I guess I would say that Lockhart and maybe even the Nix v. Whiteside or the Morrison case talk about the fairness of an adversarial proceeding. And even in Strickland, I would just add this briefly. I mean, Strickland talks about the right to effective assistance to counsel in the context of how that effective assistance impacts other rights that the defendant has in the process. And one of the rights Strickland talks about is the right under the Sixth Amendment in an independent clause to an impartial jury. So I do think you can focus on the fairness of the proceedings. For example, just briefly, Your Honor. Sure, sure, sure. Like, saying that, well, he would have been convicted anyway, even if he had gone for 11 jurors, doesn't really answer the question of whether or not counsel's deficiency in not requesting the voir dire resulted in, you know, still preserve the right to an impartial jury. So it's not really about the strength of the evidence. I appreciate that it's a difficult kind of a case on the prejudice prong, because in some sense we don't really know whether or not the 11 jurors were compromised, one of them at least, because he didn't make the inquiry. If you do have to show a reasonable probability of a different result, that would mean you'd have to show, it seems like, that one of the other 11 jurors was tainted. Right. That you would therefore move for a mistrial, and that the mistrial would be granted, and that it would be another trial, and the result is a reasonable probability of an acquittal. All those things, correct? You know, the second last part of what Your Honor said, I've always kind of had arguments about whether or not you focus on this proceeding, in other words, this trial, or do you focus generally on whether or not if there was another trial, he would have been convicted. I would argue you just look at this trial. Would the result of this trial have been different? In terms of the partiality, I guess what I would say is, you know, first of all, the judge offered a mistrial as one of the options, so the record doesn't clarify that he certainly would have granted, but it sounds like he would have if it had been requested. I think that goes to the prejudice prong in terms of the outcome of this trial, and also I think it's kind of significant in terms of whether or not the other 11 jurors were infected, that there was 35 minutes of deliberation with juror number four before the note came out to the judge, and the record doesn't show what juror four discussed. Even if he didn't say specifically, I went to the crime scene, let me tell you, everything was confirmed by what we heard from the state witness. Even if he didn't say that, the way he participated in the deliberations may have just internally reflected what he already saw. So, you know, in terms of whether or not there's kind of a doubt about whether or not the right to an impartial jury was preserved, I think that there is in terms of the prejudice prong. Also, I know that the judge should have sua sponte mistried the case. I'm sorry, Your Honor. Do you think the judge should have sua sponte mistried the case? I think he should have sua sponte said we have to wadeer the 11 jurors. I think if he found the 11 were not infected in any way and he made a reasonable conclusion factually. He told the jurors not to do any investigation on their own. Well, a mistrial certainly wouldn't have been an error. I'm trying to be as forgiving to the trial judge as possible. Why? You have a client to represent. No, I understand, Your Honor. I mean, you can make that conclusion that the judge himself had an independent. But the counsel presented this to the trial judge and I think to the state PCR as a Nash issue, right? He did. And the Nash issue, as I understand the law, you probably know it better than I do, applies once there's, the sua sponte obligation arises once there's a request for a mistrial. Correct. Under the state law. Under the state law that was presented to him or her. That's correct. Thank you. Thank you, Your Honor. Thank you. Demaselli. Good morning. May it please the court. Andrew Demaselli on behalf of the State Appellees. The crux of Mr. Sweeney's argument is that trial counsel was ineffective for failing to obtain more information about whether juror number four tainted the jury before deciding how to proceed in his trial. His argument, however, hinges on the premise that this was essentially free information and essentially risk free information. That is, there was no downside to asking for a Remmer hearing and inquiring whether the other jurors had heard anything else from juror number four. But that is not the case and I think Mr. Sweeney himself demonstrates why that's not the case. He argues in page seven and eight of his reply brief that if he had received a Remmer hearing and that Remmer hearing had shown that one or more of the jurors were tainted, the judge would have likely would have declared a mistrial on his own. One of the jurors was tainted because he knew more than the others. Well, they instruct that juror ultimately and that was something that was a foregone conclusion. But he talked to them. And he assured himself to the point that he knew what their thoughts were about it. After he told them. He said they wouldn't have any problem either. I interpret that. That's what he interpreted. That's what he said. He said they. He spoke not only for himself. He said they wouldn't. Well, in this record, for example, you assume that the only time he talked to them when all of them were present. Well, jurors arrive at different times. Nobody can ask, did you talk to one before you talked to the others? Did you talk to two or talk to three? Nothing. Nothing at all. The man went there because he wanted an accurate. An accurate assessment. Evaluation of what was seen topographically. Because there was a diagram of such as position, what a shooter may have. Was it not? Was it not? He said that he wanted to know. Was it not? Wasn't that evidence presented? Yes. Right. That's what he was talking about. He said he's topographical things. They're there, but they're not accurate. I had to go there. I went there because I wanted to see for myself. And then he said, I have no problem now basing it on what was heard in the trial. Because he verified it. He clearly, right, that's inappropriate. You can't enhance the prosecution's case or anybody else's case, the defense case, by something outside on your own. Now I can trust what I heard from that witness stand because I went on my own and I did my investigation. And not only that, I'm speaking for the other jurors. They have no problem with doing that now. The court made no inquiry. And the lawyer didn't even ask really any questions. He said, you know where I'm coming from. I don't know what that meant. He said, yeah. I agree with Judge Gregory that the burden of proof was compromised here. The government's burden of proof ends when they rest. And if it's insufficient, then they didn't satisfy the burden of proof. And they have to prove it beyond a reasonable doubt in a murder case. Juror number four, who certainly was himself tainted, was ultimately stricken from the jury. The real question before the court is whether juror number four had indicated. But you can't have a jury of 11 for a murder case. Well, you can if the defendant waives his right to a 12-person trial. No good lawyer is going to do that. I think that a good lawyer in this case did because as he testified at the post-conviction hearing, the trial was going really well for them in his perception that they were connecting with the jury. Did he put on any evidence? I'm sorry? Did he put on any evidence? Did the defendant offer any evidence at the trial? Not in his case, but he said there was no evidence. So there was no evidence from the defendant? No. So in cross-examination. What was going well for him then? He testified that he was successful in impeaching many of the state's witnesses and that he had put on a defense based on his defense about the positioning. And he didn't put on any evidence and he had to rely on the inadequacy of the government's case? I think that according to his testimony, he was confident that he was connecting with the jury. He testified that they were making headway. You can't just come up and say, I was connected. Did they wink at him? Did they nod? Did they give him a note and say, you know, you're doing pretty good? Yeah, right on. I mean, what does that mean? That's absurd. We're talking about constitutional rights in a murder case, in a life sentence, and you're talking about, well, yeah, I nodded. No. You need to find out whether or not this, what you told him that he could say, they have no problem either. And I went there to verify what was there. And Judge Boyle said it better than I could say it. That really is the important point. Their case is over. He became another witness almost with them perhaps. Because he talked to them about what he saw. And he was happy. And I can now do this. Was he the foreman of the jury? No, he left the jury. Excuse me. I don't think he was. But in any event, he was stricken. Sorry. He ultimately was stricken from the jury. And the focus on this case is whether trial counsel was unreasonable in his strategic decision based on the information that he received from juror number four in advising his client to proceed and not ask for a Remmer hearing. And what was the information he received from the juror that would make him assured that it was fine? Well, juror number four indicated that he told the other jurors that he had gone to the crime scene and that he had spoken to no one. He saw some witnesses there and that the other jurors told him to stop. And therefore, on this record. Because they knew that the judge had told them you can only consider what's here in the trial. You can't take into account any other evidence at all. Correct. So I think that the record here indicates that the rest of the jurors were not tainted. That's what trial counsel believed. That's ultimately what I think his decision was based on, that he concluded that the other jurors were not tainted based on this colloquy. And that's what he testified to at the post-conviction hearing. Counsel, there's really not any question, is there, that juror number four did something he should have done. We're not here about that. The question is, is it appropriate or is it constitutionally ineffective for a trial lawyer to have perceptions about how his cross-examination is going. My colleagues seem to say that's not something that trial lawyers do. I don't really understand that. I think that's what trial lawyers do every day. A case can go well based on cross-examination, a case in chief, just like it can go well from presenting on your affirmative case. I really have a different viewpoint about perceptions of trial lawyers, but that was kind of how I did it when I was a trial lawyer. I don't know if he's right or wrong. He might have been wrong here, but it seems like that's the sort of judgments the law says we do defer to people who are in the trenches to make. I absolutely agree with that viewpoint. I don't see how it could be. I tried cases, criminal defense cases, for 20 years. You know, in terms of what was the downside, even if he thought, Howard, this thing, I don't know, smoke signals or whatever it was that he thought it was fine, but define at least fully what he said to them. And he didn't even ask that question. I point the court to the trial counsel's post-conviction testimony. I'm not talking about his testimony. I'm talking about the trial. The best evidence is what happened at the trial. The transcript tells it all. He didn't even make any inquiries. And the judge was about to send him back in. He said, wait a minute, can I ask a question? I thought he was going to ask a good question. Instead, he just said, well, are you going to be impacted by it? First, you ought to know exactly what he said. And people don't speak in the terms of what he said. Well, I told him the same thing I told you. You don't speak in that term. He said, no, I need to tell you exactly what you said and to how many jurors you said it. How many were present? Which ones were present? That's what lawyers do. You're right, Judge Qualterbaum. Lawyers do it all the time. But they don't do it in the case where they have a tainted juror who sat there with them for at least an hour and talked to them about that. And that, you can't, a person's life is on the line. You can't just make hunches that I think it was going well in a case you didn't put anything on. I mean, that's just not even reasonable. Well, I submit to the court that at this point in time he was at a crossroads where he had to make a decision on how to proceed. What's the crossroad? The crossroad is that it is Appellant's case that he should have demanded a Remmer hearing and vaudeered the entire trial. He should have asked for a mistrial. That's what he should have asked for. He didn't want a mistrial. He should have, based on not, you're right if you ask the right questions. But not asking the right questions. Mistrial is the only reasonable way to do it. Yeah, you could do it. And why wait on a hunch when you can say, wait a minute, excuse me, Your Honor. I need to talk. I need to vaudeer extensions. I don't need to know exactly. Common sense. You know jurors don't arrive at the same time. They say they've got to be here at 9, something like that. Some come at 8.30. Some come at 1 minute to 9. Did he talk to them in a strata? I talked to 2, 3, 4, 5. That's important in a case where you're talking about a person in life sentence, in a murder case, and you don't put anybody on? I mean, we talk a little bit. My goodness. The Constitution means something in the Sixth Amendment in this idea about all we had to follow, whether or not it would have made any difference. No. Impartiality of a trial itself offends the idea of constitutional fairness, and that's what the framers did. But the appellant has not established that the jury he ultimately received and went to a verdict with was tainted. That's the thing, and I agree with Your Honor that he's entitled to an impartial jury, but they struck juror number four. He was the problem. But it's not limited to him on these facts. Would you agree that it's undisputed that he talked to the jurors? Yes. Would you agree that it's undisputed there was no question about how many he talked to, when he talked to them, and what exactly he said to them? Isn't that undisputed in this record? I don't think that the record makes clear how many he talked to or precisely what he said, other than what indicated at the court. Even if we want to know how an infected juror who talked to them said and what he said to them, isn't it that you have to do that? Even if he loved that juror, a good lawyer is going to do that and say, well, you know, based on this, he didn't say anything but good morning, I went there, and everybody said be quiet. But he said more because he said that they wouldn't have any problem either. And I interpret that as him saying that they wouldn't have a problem. That's what he said. Because he didn't tell them any information about what he saw at the crime scene. But he did. He said that he went to the crime scene to get a visual and he saw witnesses there, but he didn't give them any other information. No, he didn't say that was all he said. He said that he had to tell them, like, I went there, he got out of the car, didn't he? Yeah. Okay, where did he walk to? It's not clear from the record. Because nobody asked him. How close did you get to where supposedly the shooter was? Nobody asked. It was the lawyers sitting there. And Judge Gregory is right. Those questions weren't asked. But it's certainly not in the record that he did say anything to them besides he went to the crime scene. That's what the record shows. Maybe you can look at the comment about what they would do and you could say something about that. I see that point. But I think there's other evidence where you could read that as saying I just went to the crime scene and that's all I did. The judge told him not to. The note that came out didn't say anything that we've been told, anything other than we went to the crime scene. Now, I think it's a fair point, counsel, that, I mean, it is kind of hard to imagine why you wouldn't say, let me find out from the rest of the jurors. I mean, that's a fair question. Then you have more information to make that judgment call. I think that's the weakest part of the case. I agree, and I think that our response to that is it is not a risk-free proposition. Why is it not? Let me, I mean, I've already talked about judgment calls, and so maybe you indicate at least a fault about that. But what's the risk of getting more information from the jurors? I think as Mr. Sweeney points out in his brief, that could have forced a mistrial, a mistrial that he perhaps did not want. Why would he not want a mistrial? Because trial counsel testified that they were satisfied with the way the case was going, that they had made headway, that they could not replicate. They didn't put out any evidence. They survived, the prosecution survived a motion to dismiss at the end of the evidence, and he's anticipating that he knows what the jury is going to do. I think that trial counsel has to make reasonable assessments of how the trial is going in order to properly advise his client. But they had an opportunity for a mistrial. You would always take that. Trial counsel disagrees, and I don't think that that was an unreasonable strategic decision. He decided that based on how they had proceeded in the case thus far, that they were making headway in the courtroom, that they had significantly impeached some of the state's witnesses, and he was concerned that he would not be able to replicate that in another case. I mean, this was an extremely difficult case for them, because there were numerous eyewitnesses who testified that they saw Mr. Sweeney standing. Can you get back to this thing you said in response to my question, that asking for doing a voir dire to all the jurors would have forced a mistrial? I think there was a risk that doing that, if the other jurors had revealed that they had heard something from juror number four in addition to whatever he had revealed to the court, regardless of whether it favored the defense or the state, the trial court could have sua sponte declared a mistrial. Even if it was favorable to them. If that's discovered, then you don't want them. Assuming that the information they would have revealed would have been favorable to the state. But again, the trial counsel was concerned about losing the gains, the headway that they had made in the courtroom, and that he could not replicate that trial defense in a second trial. Of course he could. I mean, he had the record of the first trial. He had all the witnesses' testimony. He knew what the government's case would be. That was his understanding of how the trial was going. That they were connecting with the jury, that they were making this way. You misunderstood Judge Ball's question. The question is that assuming that it was going well, he would have the transcript to be able to say, wait a minute. What are you talking about? You said previously under oath this, this, this. If it was going well, he could assure it would stay in the guidelines well and better. It's just no downside to find out whether or not other apples are rotten. And you don't just go and eat the barrel of apples without even testing to see if they're rotten. I don't mean the person is rotten, but I mean in terms of. I understand. In that sense, you know, there's no downside to that. Because if they're fine, then fine. But if they're not, I'm glad, whew, I did that. I think trial counsel, he testified that it was his perception based on his colloquy with juror number four that he was satisfied that he did not share the information with the other jurors and at that point he had to make a decision on how to advise his client to proceed. And if he had forced a mistrial by going down that road, going down the Remmer Road, he would have lost the gains that he made in that trial. What gains? What gains? A verdict of guilt? What did he gain? Life and 30 years. Life and 30 years. Hindsight is 20-20. No, hindsight is not 20-20. Do what is responsible to do at the point you're supposed to do it is what you do. You're right. No one knows the future, but you deal with the present. And the present was on this record. You have to have found what exactly did you tell them and to whom and how many. And I need to know that. If that turns out to be, for example, counsel has an obligation to say the system is fair. I know you have the harder job because you're supposed to, and I know you do, make sure justice happens. Defense lawyers make sure, in fact, we've played by the rule, but their client is exonerated if it can be. But in the sense that you ought not to be, it seems to me the government ought to. And that's what it would have scared me. If it was going so well for him, look at what the other side does. I didn't hear the prosecution say a word about it. But Judge, we need to find out what they're saying about it. Because we're aware it may have helped the defense. The fact that they were saying, that's fine, whatever they want to do, fine. That would tell you right now, it doesn't seem like it was going so well in their mind. If it was, they'd want to know. But they were good with it. I think, again, trial counsel's perception was not unreasonable. And that's what the Strickland standard requires. You can say that, but this record does not support that. It really doesn't. The judge only asked one question, basically. What happened? It never admonished him. I'm surprised the judge didn't say, well, didn't I tell you not to go? It wasn't even the test document. As a matter of fact, he told them to go back into the box and they sat next to him. And the jury stayed out there. I guess it was, the record doesn't reflect, but I guess it was a white noise. I don't think the record reflects. Because the jurors were sitting right there watching the bench colloquy. Didn't even take them out. Didn't take them out while they were even questioning him about what he said. Is that right? That's right. But ultimately, the record does not reflect that juror number four revealed any other information. And it is the petitioner's burden to demonstrate under Strickland, and in post-conviction and under AEDPA, that trial counsel's decision was ultimately deficient and that it would have resulted in a different outcome. And I only have a few seconds left. He can't show it because the ineffectiveness cut him off. I'm sorry? The gateway to find out what the full taint may have been was cut off because of counsel's ineffectiveness. Well, I hate to sound like a broken record, but I think that the record itself demonstrates that juror number four did not share any additional information and that trial counsel had to make a reasonable decision in the moment about whether it was wise to demand a REMER hearing. And in this case, it was not unreasonable. It was trial strategy for counsel to ultimately advise his client to proceed with 11 jurors. To follow up on your point, assume, I mean, you state your position, assume hypothetically there's a disagreement on the deficiency prong. Is there any exception to the requirement in an effective assistance of counsel case that the petitioner show there's a reasonable probability of a different outcome? Not that I'm aware of. I think Your Honor covered this ground with my opposing counsel. The Lockhart case and the Nix case, they add to the Strickland standard. They do not supplant the Strickland standard. And therefore, in all cases, he has to demonstrate a reasonable probability of a different outcome. Not just that there's some sort of injustice. That it has to result in a different outcome. So no matter what the taint is, no matter what the taint is, for example, if one of the jurors say, yeah, I went there, and I'm sure now that what happened is that he did it. Right? So this is counterfactual. You're saying that if counsel didn't ask for a mistrial, and we hear behaviors, that we would say, it doesn't matter. You would have lost anyway. So who cares that you had a tainted juror? You think that's the law? Is that what you're telling Judge Qualiphant? You agree that that's the law? The Strickland standard requires the court to look if there's a reasonable probability of a different outcome. It can't be the law. There are many cases where people found out witnesses lied. In a death penalty case, they found out that people, witnesses, didn't tell the truth. They weren't there. You didn't tell them, well, you know, I guess you have to die. We can't, because there's no way to show that you would have got another death sentence. That's not the law. Because there's a constitutional requirement. Because this is a defect. That's why the Supreme Court case talks about the district of the trial judge has a responsibility to make sure there's a fair trial. There's a fair trial. Not just because whether or not the person would, you know, just like a counsel has a conflict of interest. We don't say, oh, you have a conflict of interest. It doesn't matter. Your client would have been found guilty anyway. No. There's something structural about that in terms of the foundations of our Constitution. It can't be the law. But anyway, go ahead. I'm about three minutes over time. And we, and I'm responsible for that as lead judge. And we enjoyed the colloquy between us. But right now, I think you're finished? I'm finished, Your Honor. I just asked the Court to affirm. Thank you so much. Thank you for your time. All right. Mr. Confucian, you have a few minutes. Do you have anything further? I have nothing further. Thank you, Your Honors, unless the Court has questions of me. Okay. Thank you. I appreciate you hearing the case. Thank you, Your Honor. We'll come down and greet counsel and then proceed to our next case.
judges: Roger L. Gregory, A. Marvin Quattlebaum Jr., Terrence W. Boyle